In this case, which was an action by the plaintiff grantor to set aside a deed executed by her because of alleged fraud on the part of the grantee in making false and fraudulent representations as to the contents of the deed — the plaintiff's evidence, while tending to show such representations and that the plaintiff was ill at the time of the execution of the deed, failing to show that she could not read or that she requested either the grantee or others present at the time of the execution of the deed to read the same to her, and also failing to show that she could not have understood the terms thereof had she read the same or had it read to her, and the evidence also failing to show any fiduciary or confidential relationship existing between the parties, and no sufficient excuse appearing why the complaining party did not read the deed — the trial court properly granted a nonsuit.
 No. 16675. JUNE 15, 1949.
Emma Jackson brought her action in the Superior Court of Walker County against J. C. Shahan and J. H. Shahan, as administrators of the estate of Callie Shahan, wherein she alleged, briefly: That on January 29, 1935, she executed a loan deed to Callie Shahan to certain described property located in Walker County; that thereafter on June 24, 1937, while this loan deed was of force and effect, Callie Shahan, "through artful means and deceitful practices and with the intent to defraud your petitioner, did induce her to execute what she later learned to be a warranty *Page 412 
deed to said described property in favor of Callie Shahan"; that on June 24, 1937, when said Callie Shahan "induced your petitioner to sign a paper, which in fact was a warranty deed," the said Callie Shahan came to the home of petitioner, in Walker County, "where petitioner was ill and confined to her home. She brought with her a paper which she requested your petitioner to sign, stating to your petitioner that it was identical with the loan deed previously signed by petitioner on January 29, 1935. Your petitioner being then and there too ill to read said paper, or understand the nature thereof, and relying upon the honesty and integrity of said Callie Shahan," signed said paper upon representation of the said Callie Shahan, as aforesaid, without knowing that the same was in fact a warranty deed to the property described in the said loan deed previously signed by her. The petitioner further alleged that, if she signed on June 24, 1937, what she later learned to be a warranty deed, it was inadvertently done; that it was without her knowledge, and with the belief that she was renewing and bringing up to date the said loan deed only; and that she at no time had any intention of signing a warranty deed to said described property.
On the trial the plaintiff testified in her own behalf as follows: "At that time, on June 24, 1937, I saw Mrs. Shahan; I saw her at my home. As to what time of the day that was; well, somewhere about one o'clock I suppose. As to whether or not there was someone with her; well, there was a car full outside, but didn't neither of them come in but her. Yes, Mr. Tarvin and them two children came in, Craig's and Henry's children; their names were Pauline and Junior. I didn't do anything at that time. I didn't talked to Judge Tarvin but very little. As to what was done after I talked to him; well, not anything only sign a paper is all. I don't know what sort of paper I signed, white is all; white paper. As to whether or not it had any writing on it; well, I didn't look, I was sick. As to whether or not I was able to be up; well, yes, up part time and down part of the time, my niece done the work. I don't know what sort of paper I signed, only what Mrs. Shahan said, I know nothing except what she said, that is all I know. I did not know that I was in fact signing what was a warranty deed; I did not know that. Yes, that was on June 24, 1937. After that time no one ever *Page 413 
told me that I had signed a warranty deed, not until they come to settle it off after she was dead. It was after Mrs. Callie Shahan's death that I first discovered I had on that occasion signed what later turned up to be a warranty deed; my niece come to pay it off, that is the first I knowed of it. It was after she died when I first discovered that I had signed a warranty deed; my niece come over here to see about it and found it. . . I am 76 years old, the 3rd day of last November. As to how long I have been in the state of health I say I was in at the time this transaction took place — well, I don't know how long it was then, but I have worked a whole lot since, but still I am in bad health now."
Tom Tarvin, whose name appears as a witness to the deed sought to be set aside and who was sworn in behalf of the plaintiff, testified in part as follows: "I do remember the occasion when I went to the home of Mrs. Emma D. Jackson in company with Mrs. Callie Shahan and her two grandchildren, Craig's little boy and Henry's little girl. Mrs. Callie Shahan was the mother of J. H. Shahan and J. C. Shahan. They called Craig's boy Junior, I don't know what his name is and I don't know where he is now. Henry Shahan's daughter's name is Pauline. At the time we went there to Mrs. Jackson's home, I could not tell you how old these children were, but it was in 1937. I don't remember whether they were going to school or not then. As to what purpose I went to the home of Mrs. Jackson with Mrs. Shahan and those two children, well, I was going over to Villanow, I lived a mile this side of Villanow, and I met Mrs. Shahan and the children and she said she had started over to my house and said she wanted me to go over to Emma D. Jackson's house with her to witness a paper. She did not say what kind of paper she wanted me to witness, but we went over there and me and Mrs. Shahan went down on the porch, and directly I think these little children came in — they were eight and ten years old I'll say, and Mrs. Shahan said to Mrs. Jackson, `Emma, I have got a paper here I want you to sign.' As to whether or not at that time Mrs. Jackson was sick in bed, well, no sir, she was not in bed, but she claimed to be sick, and Emma sat there a little bit and said, `What is it?' and Mrs. Shahan said, `It is a paper to show that you had just as soon pay me as to pay Dave,' and *Page 414 
Emma sat there a little bit and said, `If that's all there is in it, I'll sign it,' and Callie said, `That's all there is in it,' after she said she would sign it. As to whether or not I prepared the paper that was signed or it was already prepared, well, no sir, I never read it and Emma did not read it . . . As to whether or not Mrs. Jackson signed this deed in my presence and in the presence of the Shahan children and Mrs. Shahan, well, nothing was said about a deed and I never seen no deed or heard of any. This paper was not signed and executed in my presence, no sir. I have never seen this deed before in my life. The paper that I witnessed was just a piece of white paper just like the stenographer is writing on. As to whether or not it was written in pen or pencil, well, I don't remember. I did say that I did not read the contents and Mrs. Jackson did not either. We just took her word for it that it was just to show that Mrs. Jackson had just as soon pay her as Dave . . . As to whether or not Mrs. Jackson signed the paper, whatever paper it was that I'm talking about, well, she signed a paper when Callie told her it was not anything except to show that she had just as soon pay her as Dave. As to whether or not then Mrs. Jackson signed that paper, well, yes sir, she did."
The testimony of other witnesses was introduced with reference to conversations had by them with Callie Shahan after June 24, 1937, the date on which the warranty deed is alleged to have been executed, and prior to her death, with reference to claims on her part of an indebtedness owing by the plaintiff represented by the loan deed.
At the conclusion of the evidence introduced by the plaintiff, on motion of counsel for the defendant, the trial court granted a nonsuit, and to this judgment the plaintiff excepted.
While the petition in this case alleges that at the time the grantee in the deed brought it to the petitioner's home your "petitioner was ill and confined to her home. . . Your petitioner being then and there too ill to read said paper, or understand the nature thereof," the evidence set out in the statement of facts is the only evidence adduced upon the trial of the case tending to show the *Page 415 
physical and mental condition of the plaintiff at the time of the execution of the warranty deed sought to be set aside. An examination of this evidence will disclose that there is not one word of testimony tending to show that the plaintiff could not read, or that she was too ill to read, or, if she had read the paper presented for her signature, or had requested any of those present to read it to her, she was too ill to understand its nature and contents, and there is absolutely no evidence even tending to show that any fraud or artifice was practiced or used upon her to prevent her from reading at the time she signed the deed. In Lewis v. Foy, 189 Ga. 596, 598 (6 S.E.2d 788), it is held: "a party to a contract who can read must read, or show a legal excuse for not doing so, and that fraud which will relieve a party who can read must be such as prevents him from reading." See also McCullough v. Kirby, 204 Ga. 738
(51 S.E.2d 812); Tinsley v. Gullett Gin Co., 21 Ga. App. 512
(94 S.E. 892). The allegations in the petition, and the testimony in behalf of the plaintiff that the grantee in the deed made false representations as to the contents of the paper signed by the plaintiff, and that she relied upon these representations as true, are not sufficient to show such fraud as would authorize the cancellation of the deed, there being no evidence of any fiduciary or confidential relationship existing between the parties, and no sufficient excuse appearing why the complaining party did not read the deed. Weaver v. Roberson, 134 Ga. 149
(67 S.E. 662). The trial court properly granted a nonsuit.
Judgment affirmed. All the Justices concur.